# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## CASE NO. 11-13044-C

_____

**NATHAN DEAL, Governor of the
State of Georgia, et al.,**

**Defendants/Appellants.**

v.

**GEORGIA LATINO ALLIANCE
FOR HUMAN RIGHTS, et al.,**

**Plaintiffs/Appellees,**

_____

On Appeal From the United States District Court
For the Northern District of Georgia
**1:11-CV-1804-TWT**

_____

## BRIEF OF APPELLANTS

_____

| | |
|---|---|
| SAMUEL S. OLENS | 551540 |
| Attorney General | |
| | |
| KATHLEEN M. PACIOUS | 558555 |
| Deputy Attorney General | |
| | |
| DEVON ORLAND | 554301 |
| Senior Assistant Attorney General | |

Please Serve:
DEVON ORLAND
40 Capitol Sq., S.W.
Atlanta, Ga. 30334-1300
PH:    (404) 463-8850
FAX:  (404) 651-5304

**<u>Georgia Latino Alliance for Human Rights v. Deal</u>**
**DOCKET NO.: 11-13044-C**

**<u>CERTIFICATE OF INTERESTED PERSONS AND</u>**
**<u>CORPORATE DISCLOSURE STATEMENT</u>**

The undersigned attorney for Appellants hereby certifies, pursuant to 11th Cir. R. 26.1-1, that the following have an interest in the outcome of this case:

Alterna, Plaintiff/Appellee;

Asian American Legal Advocacy Center, Plaintiff/Appellee;

Bauer, Mary, Counsel for Appellees;

Beatty, Mike, Defendant/Appellant;

Blazer, Jonathon, Counsel for Appellees;

Bridges, Paul, Plaintiff/Appellee;

Broder, Tanya, Counsel for Appellees;

Brooke, Samuel, Counsel for Appellees;

Coalition of Latino Leaders, Plaintiff/Appellee;

Coalition for the People's Agenda, Plaintiff/Appellee;

Conley, Danielle, Counsel for Appellees;

Davidson, Meghan R., Assistant Attorney General, Attorney for Defendants/Appellants Deal, Olens, Beatty and Reese;

Deal, Nathan, Defendant/Appellant;

Desormeau, Katherine, Counsel for Appellees;

Doe, Jane #1, Plaintiff/Appellee;

Doe, Jane#2, Plaintiff/Appellee;

Doe, John #1, Plaintiff/Appellee;

Doe, John #2, Plaintiff/Appellee;

DREAM Activist.org; Plaintiff/Appellee;

Edwards, Paul, Plaintiff/Appellee;

Federal, Robert Keegan, Counsel for Appellees;

Georgia Latino Alliance for Human Rights, Plaintiff/Appellee;

Gruner, Sharon, Plaintiff/Appellee;

Howe, Everitt, Plaintiff/Appellee;

Jackson, Chara, Counsel for Appellees;

Jadwat, Omar, Counsel for Appellees;

Joaquin, Linton, Counsel for Appellees;

Keaney, Melissa, Counsel for Appellees;

Kuck, Charles, Counsel for Appellees;

Instituto de Mexico, Plaintiff/Appellee;

Lapointe, Michelle, Counsel for Appellees;

Ling, Sin Yen, Counsel for Appellees;

Mukherjee, Elora, Counsel for Appellees;

Olens, Samuel S., Attorney General, Attorney for Defendants/Appellants Deal, Olens, Beatty and Reese and Defendant/Appellant;

Orland, Devon, Senior Assistant Attorney General, Attorney for Attorney for Defendants/Appellants Deal, Olens, Beatty and Reese;

Pacious, Kathleen M., Deputy Attorney General, Attorney for Attorney for Defendants/Appellants Deal, Olens, Beatty and Reese;

Pickens, Andrew, Counsel for Falecia Stewart;

Pinon, Ernesto, Plaintiff/Appellee;

Preciado, Nora, Counsel for Appellees;

Reese, Clyde, Defendant/Appellant;

Segura, Andre, Counsel for Appellees;

Service Employees International Union, Plaintiff/Appellee;

Shahshahani, Azadeh, Counsel for Appellees;

Singh, Jaypaul, Plaintiff/Appellee;

Southern Regional Joint Board of Workers' United, Plaintiff/Appellee;

Spears, George Brian, Counsel for Appellees;

Speight, Benjamin, Plaintiff/Appellee;

Stewart, Falecia, Defendant;

Sugarman, Kenneth, Counsel for Appellees;

Task Force for the Homeless, Plaintiff/Appellee;

Thrash, The Honorable Thomas, United States District Judge, Northern

District of Georgia, Atlanta Division;

Tumlin, Karen C., Counsel for Appellees;

Turner, Andrew, Counsel for Appellees;

Tsu, Naomi, Counsel for Appellees;

Wang, Cecillia, Counsel for Appellees;

Werner, Daniel, Counsel for Appellees.

Respectfully submitted,


/s/ Devon Orland
Devon Orland Bar No. 554301
Senior Assistant Attorney General

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants Nathan Deal, the Governor for the State of Georgia, and Samuel S. Olen, the Attorney General for the State of Georgia respectfully submit that oral argument would be helpful to the Court as this appeal addresses the Constitutionality of a state statute, deals with novel and evolving areas of law, and touches at the core of federalism concerns regarding the interplay between state and federal regulations related to common goals. FRAP 34(a)(2)(C).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... C1

STATEMENT REGARDING ORAL ARGUMENT……………………..i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES .......................................................................... v

STATEMENT REGARDING ADOPTION OF OTHER BRIEFS .............. xi

STATEMENT OF JURISDICTION ............................................................. xi

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................ xiii

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................... xiv

STATEMENT OF THE CASE ....................................................................... 1

I.      COURSE OF THE PROCEEDINGS .................................................. 1

II.     STATEMENT OF THE FACTS ........................................................ 2

        The Challengers to HB87 ................................................................ 2

        The Statute under review ................................................................. 9

III.    STANDARD OF REVIEW .............................................................. 14

IV.     SUMMARY OF THE ARGUMENT ............................................... 15

V.      ARGUMENT AND CITATIONS OF AUTHORITY ...................... 16

        A.      THE DISTRICT COURT ERRONEOUSLY FOUND
                THAT CHALLENGERS HAD STANDING .......................... 16

                1.      The  Individual Challengers' Alleged Injuries
                        Are Speculative .......................................................... 18

a. Sections 7 and 8 require at least probable cause of the commission of a criminal offense ................................................................. 18

b. The individual Challengers do not face reasonable fear of prosecution ............................... 22

c. Challengers may not assert the rights of third parties............................................................ 23

d. The individual Challengers fail to sufficiently allege causation or redressability ........................... 23

2. The Organizational Challengers Lack Standing Because Neither The Organizations Nor Their Members Sufficiently Allege Injuries ........................... 24

a. The organizational Challengers have no standing in their own right ..................................... 24

b. The organizational Challengers have no standing on behalf of their members...................... 28

B. THE DISTRICT COURT ERRED BY ENJOINING THE ENFORCEMENT OF GEORGIA HB87 SECTIONS 7 AND 8 ................................................ 30

The Standard For Granting A Preliminary Injunction ................................................... 30

1. The District Court Improperly Determined That The Challengers Could Pursue A Private Right Of Action For Alleged Violations Of The Supremacy Clause......................................................... 31

a. As the Immigration and Naturalization Act ("INA") does not create a federal right or evidence intent to create a private remedy, the district court erred in determining that this action may be pursued under 42 U.S.C. § 1983 ................................................... 31

b. The Constitution Does Not Provide a Vehicle for a Private Suit Alleging Preemption under the Supremacy Clause ................................................. 35

2. The District Court Improperly Determined That Sections 7 And 8 Were Preempted ............................... 36

a. It was error for the district court not to apply a presumption against preemption ........................... 37

b. The district court erred in finding conflict preemption where it is possible to comply with both HB87 and Federal law ........................... 40

3. The District Court Erred In Finding That HB87 Invades A Field That Congress Intended To Occupy Exclusively ...................................................... 46

4. Challengers Failed To Show That There Were No Set Of Circumstances Where HB87 Would Be Constitutional ................................................................ 50

5. Deal And Olens Were Not Properly Enjoined ............... 51

6. Challengers Failed To Show Irreparable Harm Absent The Granting Of A Preliminary Injunction ................... 53

7. The District Court Erred In Finding That The Equities Balanced In Favor Of The Injunction. ........................... 57

CONCLUSION ............................................................................ 62

# TABLE OF AUTHORITIES

**Cases**

*Almond* v. *Kent*, 459 F.2d 200 (4th Cir. 1972) ............................................. 32

*Altria Group, Inc.* v. *Good*, 555 U.S. 70 (2008) ......................................... 40

*American Ins. Association v. Garamendi*
   539 U.S. 396 (2003) ................................................................ 48

*Ashcroft v. Al-Kidd*, No. 10-98, *slip op.* 3-9 (U.S. May 31, 2011) .............. 54

*AT&T Mobility, LLC v. NASCAR, Inc.*
   494 F.3d 1356 (11th Cir. 2007) ................................................. 14

*Babbitt v. United Farm Workers National Union*
   442 U.S. 289 (1979) ....................................................... 17, 23, 29

*Baker v. Buckeye Cellulose Corp.*
   856 F.2d 167 (11th Cir. 1988) ................................................. 31, 57

*Barnett Bank of Marion Cty., N. A.* v. *Nelson*
   517 U.S. 25 (1996) ................................................................ 42

*Bates* v. *Dow Agrosciences LLC*, 544 U.S. 431 (2005) .............................. 40

*Blessing v. Freestone,* 520 U.S. 329 (1997) ........................................... 32, 33

*Bracy v. Bramley,* 520 U.S. 899 (1997) ..................................................... 56

*Camp Legal Defense Fund, Inc. v. City of Atlanta*
   451 F.3d 1257 (11th Cir. 2006) .............................................. 16, 17

*Canal Authority of Florida v. Callaway*
   489 F.2d 567 (5th Cir. 1974) .................................................... 30

*Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011) ......................... 49

*Chapman* v. *Houston Welfare Rights Organization*
   441 U.S. 600 (1979) ..................................................... 32, 35, 36

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 2004) ........... 19, 20, 21

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) ................................... 47

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............... 18, 19, 20, 22, 55

*Common Cause/Georgia v. Billups*
  554 F.3d 1340 (11th Cir. 2009) ........................................................... 25, 26

*Crosby* v. *National Foreign Trade Council*
  530 U.S. 363 (2000) ............................................................................. 41, 42

*DeCanas v. Rica*, 424 U.S. 351 (1976) ........................................... 49, 58, 59

*Dennis v. Higgins*, 498 U.S. 439 (1991) ........................................................ 36

*Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) ............................................. 29

*E.F. Hutton & Co. v. Hadley*, 901 F.2d 979 (11th Cir. 1990) ............... 17, 18

*Elend v. Basham*,   471 F.3d 1199 (11th Cir. 2006) ..................................... 55

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ............................................. 47

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ............................... 50

*Florida Lime & Avocado Growers, Inc. v. Paul*
  373 U.S. 132, 143 (1963) ......................................................................... 41

*Florida State Conference of the National Association*
  *for the Advancement of Colored People v. Browning*
  522 F.3d 1153 (11th Cir. 2008) ................ 17, 18, 19, 21, 22, 23, 25, 26, 27

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*
  528 U.S. 167 (2000) ................................................................................. 24

*Gade* v. *National Solid Wastes Management Assn.*
  505 U.S. 88 (1992) ................................................................................... 42

*Geier* v. *American Honda Motor Co.*, 529 U.S. 861 (2000) ........................ 42

*Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989) .......... 35, 36

*Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002)..................................... 32, 33, 34

*Gould v. Wisconsin Dep't of Industry, Labor & Human Relations*
   750 F.2d 608 (7th Cir. 1984)........................................................ 35

*Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996).................. 35

*Hagans v. Lavine*, 415 U.S. 528 (1974) ........................................ 36

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)....... 17, 24, 25, 26, 27

*Hillsborough County v. Automated Med. Lab.*
   471 U.S. 707 (1985) ............................................................ 39, 41

*Hunt v. Washington State Apple Advertising Commission*
   432 U.S. 333 (1977) ............................................................ 28, 29

*Indiana Democratic Party v. Rokita,*
   458 F. Supp. 2d 775 (S.D. Ind. 2006) ........................................ 27

*Institute of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................ 30

*Lujan v.  Defenders of Wildlife*, 504 U.S. 555 (1992) ...................... 17, 18, 28

*Lynch* v. *Household Finance Corp.*, 405 U.S. 538 (1972)........................... 32

*Maine v. Thiboutot,* 448 U.S. 1 (1980) ........................................... 32

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................................. 47

*Monell v. Dep't of Social Servs.*, 436 U.S. 656 (1978) ................................ 32

*Monroe* v. *Pape*, 365 U.S. 167 (1961)............................................ 32

*Muehler v. Mena*, 544 U.S. 93 (2005) ......................................... 54

*National Alliance for the Mentally Ill*
   376 F.3d 1292 (11th Cir. 2004 ................................................. 16

*Northeastern Florida Chapter v. City of Jacksonville*
   896 F.2d 1283 (11th Cir. 1990)................................................. 54

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ............................................... 19, 53

*Pace v. CSX Transp., Inc.,* 613 F.3d 1066 (11th Cir. 2010) ......................... 39

*Pirolo v. City of Clearwater,* 711 F.2d 1006 (11th Cir. 1983) ..................... 35

*Planned Parenthood v. Sanchez;* 480 F.3d 734 (5th Cir. 2007) ................... 35

*Plyler v. Doe*, 457 U.S. 202 (1982) .............................................................. 45

*Revette v. International Association of Bridge,*
   *Structural and Ornamental Iron Workers*
   740 F.2d 892 (11th Cir.1984) ................................................................. 14

*Rice* v. *Norman Williams Co.*, 458 U.S. 654 (1982) .................................... 41

*Rizzo v. Goode*, 423 U.S. 362 (1976) .......................................................... 57

*Sampson v. Murray,* 415 U.S. 61 (1974) ..................................................... 54

*Scurlock v. City of Lynn Haven*,
   858 F.2d 1521 (11th Cir. 1988) ............................................................. 35

*Siegel v. LaPore*, 234 F.3d 1163 (11th Cir. 2000) ...................................... 53

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ......................................... 24, 26

*Solantic, LLC v. City of Neptune Beach*
   410 F.3d 1250 (11th Cir. 2005) ............................................................. 14

*Stenberg v. Carhart*, 530 U.S. 914 (2000) .................................................. 50

*Summit Med. Assoc., P.C. v. Pryor*
   180 F.3d 1326 (11th Cir. 1999) ............................................................. 52

*United States v. Brignoni-Ponce,* 422 U.S. 873 (1975) ............................... 56

*United States v. Chemical Foundation*, 272 U.S. 1 (1926) ......................... 22

*United States v. Jefferson County*, 720 F.2d 1311 (1983) ........................... 31

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................... 50

*United States v. Vasquez-Alvarez,*
  176 F. 3d 1294 (10th Cir. 1999) ................................................. 43

*Valley Forge Christian College v. Americans United*
  *For Separation Of Church And State*
  454 U.S. 464 (1982) ................................................................. 18

*Village of Hoffman Estates v. The Flipside, Hoffman Estates*
  455 U.S. 489 (1982) ................................................................. 50

*Warth v. Seldon*, 422 U.S. 490 (1975) ...................................... 17, 23, 26, 28

*Wash. State Grange v. Wash. State Republican Party*
  128 S. Ct. 1184 (2008) ............................................................. 50

*Western Airlines Inc. v. Port Authority of NY and NJ*
  817 F.2d 222 (2nd Cir. 1987) .................................................... 35

*White's Place, Inc. v. Glover*, 222 F.3d 1327 (11th Cir. 2000) .................. 24

*Wilson v. Garcia,* 471 U.S. 261 (1985) ....................................... 32

*Wisconsin Public Intervenor v. Mortier*
  501 U.S. 597, 604-05(1991) ....................................................... 37

*Wyeth v. Levine*, 129 S.Ct. 1187 (2009) ..................................... 38

## Statutes

HB87 …………. .............................................................. *passim*

8 U.S.C. § 1103 ....................................................................... 40

8 U.S.C. § 1252c ..................................................................... 40, 43

8 U.S.C. § 1324 ....................................................................... 45, 50, 55

8 U.S.C. § 1357 ....................................................................... 40, 42

8 U.S.C. § 1373 ....................................................................... 12, 43

8 U.S.C. § 1644 ....................................................................... 12, 44, 51

28 U.S.C. § 1292(a)(1) ............................................................. ix

28 U.S.C. § 1331 ..................................................................... 36

28 U.S.C. § 1343 ..................................................................... 36

42 U.S.C. § 1981 ....................................................................... 1

42 U.S.C. § 1983 ................................................ xi, 2, 15, 31, 35

O.C.G.A. § 16-11-200 ......................................................... 9, 11

O.C.G.A. § 16-11-201 ....................................................... 10, 11

O.C.G.A. § 16-11-202 ............................................................. 11

O.C.G.A. § 17-5-100 ............................................................... 12

O.C.G.A. § 36-8-5 ................................................................... 52

O.C.G.A. § 15-16-9 ................................................................. 52

O.C.G.A. § 15-16-10 ............................................................... 52

## Other Authorities

Cong. Globe, 42 Cong., 1st Sess., App. 68, 80, 83-85 ................................ 32

Cong. Rec. H10598 (daily ed. Oct. 15, 1986) ............................. 56

Ga. Const. art. IX, § 1, ¶ 3(a) ................................................. 52

Ga. Const. art. IX, § 2, ¶ 1, 2 ................................................. 51

Ga. Const. art. V, § 3, P 4 ....................................................... 51

# STATEMENT REGARDING ADOPTION OF OTHER BRIEFS

Appellants do not adopt the brief of any other party.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I certify that this brief complies with FRAP 32(a)(7)(B) and contains 13,593 words according to the word processing system utilized by the Office of the Attorney General.

This brief complies with FRAP 32(a)(5) and FRAP 32(a)(6) and has been prepared in Times New Roman 14-point font.

/s/ Devon Orland
Devon Orland
Senior Assistant Attorney General

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

Whether district court erred in finding that Challengers had a likelihood of prevailing on the merits on their preemption claim on the following grounds:

1) Whether Challengers have standing.

2) Whether Challengers can pursue a private right of action under 42 U.S.C. § 1983 or under the Supremacy Clause.

3) Whether HB87 is entitled to a presumption against preemption.

4) Whether there is conflict preemption absent a finding of impossibility.

5) Whether there is conflict and field preemption despite Congressional intent to work with the states to enforce immigrations goals and HB87 mirrors those goals.

6) Whether Challengers interest in not being caught outweighs the public interest in the enforcement of HB87.

<u>**STATEMENT OF THE CASE**</u>

**I.     COURSE OF THE PROCEEDINGS**

A group of organizations and individuals filed the instant action on June 2, 2011, challenging the constitutionality of Georgia's House Bill 87 (HB87) in its entirety ("Challengers").  (R. 1).  They challenged the statute based upon the Supremacy Clause to the United States Constitution, the Fourth Amendment, the right to travel, the Fourteenth Amendment, 42 U.S.C. § 1981 and the Georgia Constitution.[1]  Challengers filed a Motion for Preliminary Injunction seeking to preliminarily enjoin enforcement of Sections 7, 8 and 19.  (R. 29).  Deal, Olens, Beatty and Reese ("State") filed a Motion to Dismiss the complaint in its entirety (R. 47).  Challengers responded.   (R. 76).    The State filed a response to the Motion for Preliminary Injunction and an objection to submitted evidence. (R. 70, 72).  All briefing subsequent to the filing of the Motion for Preliminary Injunction was expedited.  (R. 46).  The Court conducted a hearing on both motions on June 20, 2011.  (R. 80, 82).  The Court entered an order on both of these motions on June 27, 2011 where it granted both Motions in part.  (R. 93).  The Court enjoined the enforcement of Sections 7 and 8 of HB87 based upon the Challengers' likelihood of prevailing on the merits of their

---

[1] Challengers withdrew all state law claims.

preemption claims and dismissed all other claims. Specifically, the Court determined that Challengers had standing to bring the action, a claim for preemption could be brought pursuant to 42 U.S.C. § 1983, and under the Supremacy Clause, Sections 7 and 8 of HB87 are preempted by federal law. (R. 93). The State timely filed a Notice of Appeal. (R. 97).

## II.   STATEMENT OF THE FACTS

*The Challengers to HB87*

Challengers are comprised of 10 organizations with varied missions and purposes, as well as 12 individuals. (R. 1, ¶¶ 17-60).

Georgia Latino Alliance for Human Rights ("GLAHR") provides community outreach to immigrant communities to assist in cultural transitions. (*Id.*, ¶ 17). GLAHR provides transportation to members (including illegal aliens) to attend activities. (*Id.*, ¶ 19). GLAHR claims HB87 will cause it to divert resources from "activities central to its mission" by requiring it to educate members about HB87 instead of local ordinances. (*Id.*, ¶ 18). GLAHR asserts it has experienced decreased attendance due to members' fear they will be targeted and interrogated by police. (*Id.*, ¶¶ 18-19). GLAHR claims members lack identification and will be subjected to increased scrutiny. (*Id.*, ¶ 19).

Service Employees International Union ("SEIU") is a labor organization that addresses discrimination and seeks immigration reform. (*Id.*, ¶ 20). SEIU alleges its members will face increased police scrutiny and will refrain from attending events. (*Id.*, ¶ 21).

Southern Regional Joint Board of Workers' United's ("Joint Board") mission is to organize, represent and empower employees in Georgia and seek immigration reform. (*Id.*, ¶ 22). (*Id.*) Joint Board alleges that its members will face increased police scrutiny, and will refrain from attending events, impeding Joint Board's ability to organize members. (*Id.*, ¶¶ 23-24). Joint Board claims some members lack identification required by HB87 and will risk detention. (*Id.*, ¶ 24). Joint Board submits employers won't hire individuals who look or sound "foreign" and HB87 will chill efforts to provide transportation to events. (*Id.*, ¶ 25). Joint Board contends it will have to divert resources from nonspecific "core organizational priorities" to educate members about HB87. (*Id.*)

DREAM Activist.org ("DREAM") seeks to pass the DREAM Act, which addresses issues faced by young students brought into the United States when they were young. (*Id.*, ¶ 26). DREAM submits that some of its members do not have identification required by HB87 and risk prolonged immigration status checks. (*Id.*, ¶ 27). DREAM hosts conferences and

training sessions in Georgia for undocumented students nationwide and provides undocumented students housing and transportation. (*Id.*, ¶ 28).

Task Force for the Homeless ("TFH") offers a homeless shelter and social services to illegal aliens. (*Id.*, ¶ 29). TFH alleges it has diverted resources from "organizational priorities" to educate volunteers and residents about HB87. (*Id.*, ¶ 30). TFH fears criminal liability for providing emergency shelter, services and transportation without regard to immigration status. (*Id.*, ¶ 31). TFH claims many members lack identification required by HB87 and risk additional police scrutiny and detention. (*Id.*)

Asian American Legal Advocacy Center ("AALAC") promotes the civil, social and economic rights of Asian Americans. (*Id.*, ¶ 33). AALAC claims it has exhausted its resources to respond to HB87. (*Id.*) AALAC contends HB87 will impact its "ability to satisfy its mission" since members of the community seek guidance on HB87. (*Id.*)

Alterna provides social services to the Latino immigrant community, including many illegal aliens. (*Id.*) Alterna fears criminal liability for providing transportation and housing. (*Id.*, ¶ 35). Alterna avers it has experienced less participation and has had to alter programming and divert resources to answer questions about HB87. (*Id.*)

Coalition of Latino Leaders ("CLILA") develops competent Latino leadership in the local community and provides various services to members, including illegal aliens. (*Id.,* ¶ 36) CLILA asserts that it has experienced decreased attendance due to members' fears they will be identified as illegal aliens. CLILA fears criminal prosecution for providing transportation to members and claims it has diverted resources by cancelling classes in order to respond to an increased number of calls inquiring about HB87. (*Id.,* ¶ 37)

Instituto de Mexico, Inc. of Atlanta ("Instituto") fosters the development of the Mexican community, promotes Mexican history and cultivates mutual understanding between the Mexican and American cultures. (*Id.*, ¶ 38). Instituto submits that HB87 will cause decreased attendance because individuals fear they will be targeted by police concerning their immigration status. (*Id.*, ¶¶ 38-39).

Georgia Coalition for the Peoples' Agenda ("CPA") seeks to improve the quality of governance in Georgia. (*Id.* at 40) CPA claims that some members lack identification required by HB87 and will be subjected to lengthy detentions and investigations, as well as the economic burden of obtaining the required identification. (*Id.*, ¶ 41). CPA fears racial profiling and decreased attendance at events and submits it will need to divert resources from projects in order to respond to HB87. (*Id.,* ¶ 42).

Paul Bridges, the mayor of Uvalda, fears prosecution because he provides transportation to illegal aliens. (*Id.*, ¶¶ 43-44). Bridges also fears prosecution for allowing illegal aliens to live in his home. (*Id.*, ¶ 44). Lastly, Bridges fears HB87 will harm others in his town for a variety of reasons. (*Id.*, ¶ 45).

Benjamin Speight is the Organizing Director for Teamsters Truck Drivers and Helpers Local 728, and in that role transports illegal aliens and sometimes commits traffic violations. (*Id.*, ¶ 46). Speight fears criminal prosecution under HB87. (*Id.*)

Everitt Howe is the Vice President of a social justice program and works as a caseworker for a community service program at his church. (*Id.*, ¶ 47). Howe fears prosecution because he transports illegal aliens to medical appointments and sometimes commits traffic violations. (*Id.*)

Paul J. Edwards is a board member of Alterna who fears prosecution for transporting illegal aliens to church and medical appointments during which time he sometimes commits traffic violations. (*Id.*, ¶ 48). Edwards fears prosecution because Alterna provides housing for illegal aliens. (*Id.*) Edwards also fears criminal liability if he invites out-of-state illegal aliens to his home. (*Id.*) Edwards believes HB87 will decrease public safety because

the immigrant community will be less likely to cooperate with law enforcement. (*Id.*)

Sharon Gruner is a student who volunteers with CLILA. (*Id.*, ¶ 49). Gruner fears prosecution for her volunteer work, which includes transporting illegal aliens to classes and meetings. (*Id.*) Gruner also fears prosecution for providing shelter through CLILA. (*Id.*)

Jane Doe #1 is married to an illegal alien and fears prosecution for transporting her husband since she sometimes commits traffic violations. (*Id.*, ¶ 50). Jane Doe #1 also fears prosecution for harboring illegal aliens if she invites her in-laws to visit her. (*Id.*)

Jaypaul Singh is a United States citizen and Washington resident. (*Id.*, ¶ 51). Singh will be working in Atlanta for the summer and fears he could be subjected to detention if he is stopped for a traffic violation. (*Id.*)

Ernesto Piñon is a United States citizen and Washington resident. (*Id.*, ¶ 52). Piñon plans to travel to Georgia and fears he could be subjected to extended detention if he is stopped for a traffic violation. (*Id.*)

John Doe #1 is a Mexican national who alleges he will be afraid to leave his home because he fears racial profiling. (*Id.*, ¶ 53). John Doe #1 alleges that he will be afraid to call police if he is the victim or witness to a crime. (*Id.*)

John Doe #2 is a Mexican national and does not have identification required by HB87. (*Id.*, ¶ 55). John Doe #2 fears encounters with law enforcement and avoids driving, but also fears he may be stopped and subjected to an immigration status check if walking or riding his bicycle. (*Id.*) John Doe #2 avers he will have difficulty getting rides from his friends because they could be subjected to criminal liability under HB87. (*Id.*) In addition, John Doe #2 asserts that he may not report future crimes to police for fear that they will arrest him. (*Id.*)

Jane Doe #2 is a Mexican national who has been granted deferred action but lacks the paperwork showing the same or identification required by HB87. (*Id.*, ¶¶ 57-58). As a result, Jane Doe #2 fears detention and will avoid encounters with the police. (*Id.*, ¶ 59).

David Kennedy is an immigration lawyer who gives legal advice to illegal aliens and occasionally drives them to court hearings during which he sometimes commits traffic violations. (*Id.*, ¶ 60). Kennedy fears prosecution for providing legal advice to his clients, as well as harboring, transporting and inducing them to enter Georgia. (*Id.*)

*The Statute under review*

## HB87

The Georgia Legislature adopted HB87 in an effort to control the impact of illegal immigration on Georgia taxpayers. The district court enjoined Sections 7 and 8 of the Bill. The Bill does not regulate or define immigration, lawful status or citizenship.[2] Rather, Section 7 adopts the definition of illegal alien codified by the federal government and criminalizes behavior of others who first commit another criminal offense and then assist those who facilitate illegal immigration by knowingly and intentionally harboring, enticing or transporting an illegal alien within the state. Section 8 establishes a process whereby police, who otherwise have probable cause to believe a crime has been committed, have the authority to act reasonably to determine alienage. If it is determined that an individual is illegal, as defined by federal law, the officer can take steps to detain that individual if otherwise authorized to do so.

The complained of provisions in Section 7 are codified in three different statutes, the relevant portions are as follows:

O.C.G.A. § 16-11-200(b)

---

[2] All provisions define illegal alien as, "a person who is verified by the federal government to be present in the United States in violation of federal immigration law." O.C.G.A. § 16-11-200 (a)(1); 16-11-201 (2); 16-11-202(a); O.C.G.A. § 17-5-100(a)(2).

A person who, while committing another criminal offense, knowingly and intentionally transports or moves an illegal alien in a motor vehicle for the purpose of furthering the illegal presence of the alien in the United States shall be guilty of the offense of transporting or moving an illegal alien….

Specifically excluded from this provision are:
(1)     a government employee transporting or moving an illegal alien as a part of his or her official duties or to any person acting at the direction of such employee;
(2)     A person who transports an illegal alien to or from judicial or administrative proceeding when such illegal alien is required to appear pursuant to a summons, subpoena, court order, or other legal process;
(3)     A person who transports an illegal alien to a law enforcement agency or a judicial officer for official government purposes;
(4)     An employer transporting an employee who was lawfully hired; or
(5)     A person providing privately funded social services.

Next, O.C.G.A. § 16-11-201 provides a penalty for harboring an illegal alien. "'Harboring or harbors' means any conduct that tends to substantially help an illegal alien to remain in the United States in violation of federal law but shall not include a person providing services to infants, children, or victims of a crime; a person providing privately funded social services; a person providing emergency medical service; or an attorney or his or her employees for the purpose of representing a criminal defendant." O.C.G.A. § 16-11-201 (a)(1).

This provision also provides that, "A person who is acting in violation of another criminal offense and who knowingly conceals, harbors, or shields

an illegal alien from detection in any place in this state, including any building or means of transportation, when such person knows that the person being concealed, harbored, or shielded is an illegal alien, shall be guilty of the offense of concealing or harboring an illegal alien." O.C.G.A. § 16-11-201(b).

Lastly, O.C.G.A. § 16-11-202(b) provides that, "A person who is acting in violation of another criminal offense and who knowingly induces, entices, or assists an illegal alien to enter into this state, when such person knows that the person being induced, enticed or assisted to enter into this state is an illegal alien, shall be guilty of the offense of inducing an illegal alien to enter into this state." All three provisions require the commission of another criminal offense prior to being charged and specific knowledge by the offender of the alien status of the person transported, harbored or induced. The statutes do not provide for additional identification checks of passengers or cohabitants nor do they provide for an enforcement mechanism against the illegal alien but rather against the individual who transports, harbors or induces the illegal alien. Importantly, the statutes specifically **exclude** from criminal liability persons who perform a prohibited act as part of the provision of social services under O.C.G.A. § 16-11-200 and 16-11-201.

Next, Challengers complained about the provisions in Section 8 of the

Bill.  Section 8 is codified as O.C.G.A. § 17-5-100 and provides:

(a) As used in this Code section, the term:
   (1) "Criminal violation" means a violation of state or federal criminal law but shall not include a violation of a county or municipal law, regulation, or ordinance.
   (2) "Illegal alien" means a person who is verified by the federal government to be present in the United States in violation of federal immigration law.
(b) Except as provided in subsection (f) of this Code section, during any investigation of a criminal suspect by a peace officer, when such officer has probable cause to believe that a suspect has committed a criminal violation, the officer shall be authorized to seek to verify such suspect's immigration status when the suspect is unable to provide one of the following:
   (1) A secure and verifiable document as defined in Code Section 50-36-2;
   (2) A valid Georgia driver's license;
   (3) A valid Georgia identification card issued by the Department of Driver Services;
   (4) If the entity requires proof of legal presence in the United States before issuance, any valid driver's license from a state or district of the United States or any valid identification document issued by the United States federal government;
   (5) A document used in compliance with paragraph (2) of subsection (a) of   Code Section 40-5-21; or
   (6) Other information as to the suspect's identity that is sufficient to allow the peace officer to independently identify the suspect;
(c) When attempting to determine the immigration status of a suspect pursuant to subsection (b) of this Code section, a peace officer shall be authorized to use any reasonable means available to determine the immigration status of the suspect, including:
   (1) Use of any authorized federal identification data base;
   (2) Identification methods authorized by federal law, including those authorized by 8 USCA § 1373(c), 8 USCA § 1644;
   (3) Use of electronic fingerprint readers or similar devices; or
   (4) Contacting an appropriate federal agency.
(d) A peace officer shall not consider race, color, or national origin in

12

implementing the requirements of this Code section except to the extent permitted by the Constitutions of Georgia and of the United States.

(e) If during the course of the investigation into such suspect's identity, a peace officer receives verification that such suspect is an illegal alien, then such peace officer may take any action authorized by state and federal law, including, but not limited to, detaining such suspected illegal alien, securely transporting such suspect to any authorized federal or state detention facility, or notifying the United States Department of Homeland Security or successor agency. Nothing in this Code section shall be construed to hinder or prevent a peace officer or law enforcement agency from arresting or detaining any criminal suspect on other criminal charges.

(f) No person who in good faith contacts or has contact with a state or local peace officer or prosecuting attorney or member of the staff of a prosecuting attorney for the purpose of acting as a witness to a crime, to report criminal activity, or to seek assistance as a victim to a crime shall have his or her immigration status investigated based on such contact or based on information arising from such contact.

Challengers maintained that their risk of harm outweighed the harm to the State. In support of their argument, Challengers offered affidavits from individuals and organizations that claimed they would be stopped and harassed for providing transportation, housing or otherwise assisting illegal aliens to come to and remain in the state of Georgia. Challengers further contended that legal and illegal residents of the state will be targeted for detention by law enforcement in order to verify citizenship.

The State proffered evidence that the presence of illegal immigrants in Georgia impacted the citizens of the state by increasing unemployment (R. 70, ex. C), increasing expenses in prisons and jails (R. 70, ex. F, G, H), and

costing over 53 million dollars in Medicaid for fiscal year 2011. (R. 70, ex. K).  The district court determined that, based upon the evidence presented, the harm to the Challengers outweighed the harm to the State and that it was in the public interest to enjoin Sections 7 and 8 of HB87.

It is from the district court's decision to enjoin these provisions that the State appeals.

## III.   STANDARD OF REVIEW

The Court generally will reverse a district court's order granting a preliminary injunction in the event of an abuse of discretion. *See Revette v. International Association of Bridge, Structural and Ornamental Iron Workers,* 740 F.2d 892, 893 (11th Cir.1984).  However, where the district court's error is based upon the application of the law it is reviewed *de novo* as the application of an improper legal standard is never within the district court's discretion.  *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1253 (11th Cir. 2005).The Court's review of standing as a threshold jurisdictional issue is reviewed *de novo. AT&T Mobility, LLC v. NASCAR, Inc.*, 494 F.3d 1356, 1359-1360 (11th Cir. 2007).

## IV. SUMMARY OF THE ARGUMENT

The district court erred in enjoining enforcement of Sections 7 and 8 of HB87 as Challengers do not have a likelihood of prevailing on the merits, have not shown irreparable injury and because the harm to the public far outweighs their interest.

Challengers do not have standing to pursue this action as they cannot show the requisite causation, injury or interest. Challengers cannot bring a private claim for preemption under 42 U.S.C. § 1983 as the INA does not provide them with a privately enforceable right nor does it imply such a remedy. Further, Challengers cannot bring an action under the Supremacy Clause as it is not a source of any right.

Assuming Challengers can bring this action, the district court improperly failed to apply a presumption against preemption. In doing so the district court improperly determined there to be conflict preemption absent a showing of impossibility and despite clear Congressional intent to work in conjunction with state and local governments to enforce immigration objectives. Similarly, the district court erred in finding field preemption where HB87 mirrors the same objectives evidenced by Congress and furthers the intent of Congress to allow joint enforcement of immigration objectives.

The district court erred in finding that Challenger's risk that they are more likely to be caught committing a criminal or civil violation outweighs the public's interest in enforcing the law and conserving state resources in expenditure of funds related to the care of illegal aliens in the state.

## V. ARGUMENT AND CITATIONS OF AUTHORITY

### A. THE DISTRICT COURT ERRONEOUSLY FOUND THAT CHALLENGERS HAD STANDING.

The district court incorrectly found that Challengers have standing to bring this action because none of them demonstrated the required injury, causation or redressability as their purported fears of criminal prosecution (Section 7) and/or prolonged immigration status checks (Section 8) are too speculative.

"Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Camp Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quotations and citations omitted). The party invoking federal jurisdiction has the burden of proving standing. *National Alliance for the Mentally Ill*, 376 F.3d 1292, 1294 (11th Cir. 2004). To establish standing, each individual or organization must demonstrate three constitutional requirements "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the

causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Camp Legal Defense Fund, Inc*., 451 F.3d at 1269 (quotations and citations omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).

To meet the actual injury requirement, there must be a realistic danger of sustaining a direct injury as a result of the statutory enforcement. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979). The plaintiffs must allege both "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Id*. The fear of prosecution must be more than imaginary or speculative. *Id.; Warth v. Seldon*, 422 U.S. 490, 508 (1975); *Florida State Conference of the National Association for the Advancement of Colored People v. Browning*, 522 F.3d 1153 (11th Cir. 2008); *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 984 (11th Cir. 1990). To be imminent, the harm must be "one that is likely to occur immediately," meaning, "within some fixed period of time in the future." *Browning*, 522 F.3d at 1160-61.

In addition to showing an injury in fact, the plaintiffs must show that the injury is fairly traceable to the alleged unlawful conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Finally, the plaintiffs must

demonstrate that the requested relief likely will redress the injury. *E.F. Hutton & Co.*, 901 F.2d at 984 (*citing*, *Valley Forge Christian College v. Americans United For Separation Of Church And State*, 454 U.S. 464, 472 (1982)). It is not sufficient for the party to speculate that the alleged injury would be redressed. *Lujan*, 504 U.S. at 561.

   1. *The Individual Challengers' Alleged Injuries Are Speculative*

     a. <u>Sections 7 and 8 require at least probable cause of the commission of a criminal offense</u>

  Sections 7 and 8 both demand either the commission of a criminal offense or probable cause to believe a person has committed a criminal violation, which undermines any suggestion that the alleged harm in enforcing the statute is imminent or likely. This point is best illustrated in *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), where the Court concluded that a plaintiff lacked standing to enjoin the police from using a choke hold on suspects absent a threat of deadly force to resist arrest because he failed to sufficiently demonstrate an injury in fact. The plaintiff's purported injury of being subjected to unlawful choke holds in *Lyons* amounted to "conjecture and speculation" because it required an open-ended sequence of improbable events to occur. *Browning*, 522 F.3d at 1162. More specifically, the plaintiff would have to cause a police encounter, the city

would have to authorize unnecessary choke holds and the police would have to use an unnecessary choke hold in a specific encounter. *Lyons*, 461 U.S. at 105-08. Thus, the injury alleged in *Lyons* "was predicated on the plaintiff first doing something that would at least give an officer probable cause to detain or arrest him"; however, the Supreme Court is hesitant to assume a plaintiff will routinely violate the law. *Browning*, 522 F.3d at 1162; *see also O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction"). In addition, the plaintiff in *Lyons* had an adequate remedy at law because he could sue for damages. *Browning*, 522 F.3d at 1162.

The district court acknowledged *Lyons*, but determined that the facts present here are more akin to *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 2004). (R. 93, pp.8-11). In *Church*, the plaintiffs were homeless residents seeking to enjoin the city from removing them simply because they were homeless, as well as from harassing, intimidating, detaining or arresting them for walking, talking, sleeping or gathering in public places simply because they were homeless. *Church*, 30 F.3d at 1335. In determining the plaintiffs had standing, this Court distinguished volitional acts from those beyond one's control. Significantly, this Court acknowledged unwillingness to assume a party will repeat misconduct

leading to the alleged injury and "[t]hus, in *Lyons*, the Supreme Court refused to assume that the plaintiff would again violate the traffic laws, prompting the police to stop him." *Id.* at 1338. This Court distinguished violating traffic laws from conduct "beyond the plaintiff's control" such as their involuntary homelessness. *Id.* This Court further noted that the policy in *Lyons* "did not necessarily authorize the constitutional deprivation . . . suffered" as compared to *Church* where the policy at issue authorized constitutional violations. *Id.* at 1339.

HB87 is more like *Lyons* than *Church*. Contrary to the district court's finding, the requirement of a separate criminal violation as set forth in Sections 7 and 8 makes the Challengers' threat of injury unrealistic because courts do not assume individuals will commit criminal violations. *Church*, 30 F.3d at 1338. The district court erroneously took issue with the fact that Section 8 requires only probable cause, and that any criminal offense, including traffic violations or transporting and harboring an illegal alien in violation of Section 7, would suffice. (R. 93, pp. 10-11). First, the fact that the underlying criminal offense could be a traffic violation, as opposed to a more significant criminal offense, is of no consequence. Indeed, the same was true in *Lyons*. *See Lyons*, 461 U.S. at 105-08; *Church*, 30 F.3d at 1338. Furthermore, while it is true that the violation of an offense enumerated in

Section 7 could serve as the underlying criminal offense required in Section 8, the district court overlooked the fact that before any offense contained in Section 7 could be enforced, the individual would have to also be committing *another* criminal offense. *See* HB87, Section 7, Article 5, 16-11-200(b), 16-11-201(b), 16-11-202(b).

Because both Sections 7 and 8 require at least probable cause as to the commission of a criminal offense, HB87, Section 7, Article 5, 16-11-200(b), 16-11-201(b), 16-11-202(b); Section 8, Article 5, 17-5-100(b), the individual Challengers' fears are too speculative to establish standing, *Browning*, 522 F.3d at 1162.

Moreover, the district court erred in finding that HB87 amounts to a formal policy like that challenged in *Church*. (R. 93, pp. 8-9). While the circumstances required to invoke Section 8 may not be as attenuated as *Lyons*, it is not automatic like the formal policy in *Church*. Contrary to the district court's suggestion that routine encounters would necessarily result in lengthy status investigations, the status investigation set forth in Section 8 is not mandatory. *See* HB87, Section 8, Article 5, 17-5-100(b). Moreover, Challengers premise their fears of status investigations on racial profiling, but HB87 prohibits such conduct, Section 8, Article 5, 17-5-100(d) ("race, color, or national origin" should not be considered to implement Section 8

except as permitted by the Georgia and U.S. Constitutions), and courts should presume that law enforcement will properly enforce the law, *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926). If HB87 was applied in an unconstitutional manner, the individual plaintiffs could address those violations in a lawsuit for damages. *Browning*, 522 F.3d at 1162. Thus, HB87 is more akin to the policy in *Lyons*, particularly in light of the requirement for at least probable cause to believe the individual has committed a separate criminal offense. Therefore, like the plaintiff in *Lyons*, Challengers lack standing.

> b. The individual Challengers do not face reasonable fear of prosecution

The individual Challenger's "fear" of prosecution under HB87 is not reasonable. For example, although Challengers Howe, Edwards and Gruner fear prosecution for providing transportation or housing in conjunction with their social organizations, HB87 exempts them from liability as a "person providing privately funded social services." *See* HB87, Section 7, Article 5, 16-11-200(d)(5), 16-11-201(a)(1). Similarly, although Challengers John Doe #1, John Doe #2 and Jane Doe #2 fear police investigations for reporting a crime, HB87 states that no such investigation may be based on good faith contact regarding witnessing a crime, reporting criminal activity or seeking assistance as a victim. *See* HB87, Section 8, Article 5, 17-5-

100(f).   Because these individual Challengers have no reasonable fear of prosecution under HB87, they have no actual or imminent injury sufficient to establish standing.  *See Babbit*, 442 U.S. at 298.

        c.      <u>Challengers may not assert the rights of third parties</u>

Additionally, while Challengers Bridges and Edwards allege fears for others in the community, such as decreased public safety, disruption of families and impact on businesses, these allegations are purely speculative. *Browning*, 522 F.3d at 1162.   In accordance with prudential standing, individuals may not typically raise claims for injuries suffered by third parties.  *Warth*, 422 U.S. at 499.   Therefore, Challengers asserting injuries on behalf of others lack standing.

        d.      <u>The individual Challengers fail to sufficiently allege causation or redressability</u>

The individual Challengers cannot establish that their claimed future injuries would be caused by HB87 or that any such injuries would be redressed by a favorable decision.   For instance, Challengers seeking to provide transportation or housing through their social organizations cannot establish causation or redressability because their desired actions are not precluded by HB87.  *See* Section A.1.a, *supra*.

2. *The Organizational Challengers Lack Standing Because Neither The Organizations Nor Their Members Sufficiently Allege Injuries*

a. The organizational Challengers have no standing in their own right.

To establish standing to bring claims in its own right, an organization must allege, and ultimately prove, the same requirements discussed above with respect to the individual plaintiff. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 177 (2000); *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000). Thus, the organizational plaintiffs must allege that they have suffered a tangible injury. *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). It is not sufficient for the organization to claim that it has an ideological or abstract social interest that has been adversely affected. *Id.* at 739-40. Rather, the injury must be concrete and demonstrable. *Havens*, 455 U.S. at 379.

The district court erred in concluding that Challengers' alleged diversion of resources was sufficient to establish the requisite injury. Law to the contrary is readily distinguishable. In *Havens*, the Supreme Court addressed standing under the Fair Housing Act where an organization alleged that unlawful racial steering practices had frustrated it's mission to assist with equal access and housing referral services because it was required to devote resources to counteract the racially discriminatory practices.

*Havens*, 455 U.S. at 378-79. The Supreme Court concluded that the organization suffered an injury in fact because the illegal practice of racial steering had "perceptibly impaired" the organization's ability to provide the services it was formed to provide. *Id.* at 379. The Supreme Court explained that "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract societal interests." *Havens*, 455 U.S. at 379 (*citation omitted*).

This Circuit subsequently applied *Havens* outside the context of the Fair Housing Act in cases involving voting rights. In *Browning*, the plaintiff alleged that because of an impending voter registration requirement, the organization had to divert resources from voter registration drives to educate voters. 522 F.3d at 1165-66. The Court found that the organization had alleged injuries sufficient to establish standing because it alleged an inability to conduct specific projects instead of "abstract societal interests" and the anticipated injuries satisfied the immediacy and likelihood requirements because they would all occur before the November 2008 election and it was likely that at least one injury would occur. *Id.* at 1161-64, 1166. The Court concluded the organization "reasonably anticipated" the need to divert resources. *Id.* at 1165. In *Billups*, this Circuit again applied *Havens* in the

voting context finding that the organization established an injury for purposes of standing because it was actively involved in voting rights activities and would need to divert resources from normal activities. *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009).

It should be noted that Challengers SEIU, DREAM and Instituto do not allege that they have diverted resources. Further, while other Challengers allege diversion of resources, they make only conclusory assertions that they will be required to divert resources from nonspecific objectives, missions or priorities in order to provide education about HB87 as opposed to allegations establishing that HB87 impacts their particular missions in specific ways. (*See, e.g.,* R. 1, ¶¶ 18, 25, 30, 33, 35, 42). Unlike the organizations in *Havens, Browning* and *Billups*, Challengers seek only to service abstract societal interests, which is insufficient to establish standing under Article III.[3] *Havens*, 455 U.S. at 379; *Sierra Club*, 405 U.S. at 735.

> As a matter of policy, to find that such conclusory assertions are sufficient to establish the requisite injury for standing under Article III would completely eviscerate the standing doctrine. If an organization obtains standing merely by expending resources in response to a statute, then Article III standing could be obtained through nothing more than filing a lawsuit. Such an interpretation flies in the face of well-established standing principles.

---

[3] Complaints like those raised here amount to generalized grievances for the public at large and violate prudential requirements of standing. *See Warth*, 422 U.S. at 499.

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 816-17 (S.D. Ind. 2006).

Additionally, the stated missions and purposes of the organizational Challengers are not sufficiently related to HB87. In *Havens*, the organization's purpose was to provide equal housing and referrals and the illegal practice was racial discrimination; thus, the alleged harm and purported cause were intimately related. *See Havens*, 455 U.S. at 378-79. In *Browning* and *Billups*, the organizations identified specific voting projects interfered within a distinct time period by the imposition of additional voting requirements; thus, the alleged harms and purported causes were intimately related. *See Browning*, 522 F.3d at 1165-66; *Billups*, 554 F.3d 1340. Here, Challengers serve causes related to broad societal issues of immigration that lack components or purposes directly related to the requirements actually imposed by Sections 7 and 8 of HB87. (*See*, *e.g.*, R. 1, ¶¶ 17, 20, 26, 33, 36, 38, 40). As such, the present case is distinguishable.

Furthermore, in *Browning* the Court noted that the organizational plaintiffs also satisfied the requirements of immediacy and likelihood of injury. *Browning*, 522 F.3d at 1165-66. The organizational Challengers fail to establish immediacy and likelihood of injury for the same reasons outlined above, including the fact that none of them are prevented from

providing transportation, housing or any other privately funded social service to their undocumented members. *See* Section A.1.b., *supra*. Also, while GLAHR, SEIU, Joint Board, Alterna, CLILA, Instituto, and CPA fear decreased membership and attendance at events because of members' fears, that fear is hypothetical, speculative and unfounded in light of the clear terms of HB87 that prohibit unconstitutional racial profiling and require criminal conduct before any immigration status investigation. *See* Section A.1.a., *supra*. Because HB87 does not allow or provide for the police conduct and actions Challengers purportedly fear, they cannot establish that their injury is "fairly traceable" to enactment of HB87. *See Lujan*, 504 U.S. at 360. Therefore, the organizations lack standing to bring this action in their own right.

        b.    <u>The organizational Challengers have no standing on behalf of their members</u>

Although not addressed by the district court, in light of its finding that the organizations had standing in their own right, the State maintains that the organizations lack standing to challenge HB87 on behalf of their members.

In the absence of injury to itself, an organization may still have standing as the representative of its members. *Warth*, 422 U.S. at 511. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) determined that an association has standing to bring suit on behalf of its

members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members. *Id.* at 343; *see also Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999).

The members have no standing in their own right for all of the reasons previously stated. While some Challengers allege that members have been stopped and targeted because of their appearance, any such allegation lacks the required causation because HB87 had not yet gone into effect. *See Lujan*, 504 U.S. at 560. In any event, HB87 specifically provides that officers may not consider race, color or national origin except to the extent already permitted by the Georgia and U.S. Constitutions. *See* Section A.1.a., *supra*; *Babbit*, 442 U.S. at 298. Similarly, although some Challengers assert that members fear additional police scrutiny because they do not have identification acceptable under HB87, to be subjected to a status verification, they would first have to commit or give probable cause to believe they committed a criminal offense. *See* Section A.1.a., *supra*. Relying on an intentional commission of a criminal offense is too speculative to establish an injury. *Id.* The same is true for allegations that members fear criminal liability for transporting or housing illegal aliens as both provisions first

require a criminal offense and expressly set forth exceptions for privately funded social services. *See* Section A.1.b., *supra*. Furthermore, the interests the organizations seek to protect are not germane to any of their stated purposes which are unrelated to the subject matter of the specific provisions at issue. *See* Section A.2.a., *supra*. Accordingly, Challengers failed to establish standing through their members.

## B. THE DISTRICT COURT ERRED BY ENJOINING THE ENFORCEMENT OF GEORGIA HB87 SECTIONS 7 AND 8

### The Standard For Granting A Preliminary Injunction

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). The "sole purpose is to preserve the relative positions of the parties until a trial on the merits can be held." *Institute of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "The movant must show (1) a substantial likelihood of prevailing on the merits; (2) that Plaintiff will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; and (4) that if issued, the injunction would not be adverse to the public interest." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d

167, 169 (11th Cir. 1988).  Plaintiffs carry the burden of persuasion on all four standards.  *United States v. Jefferson County*, 720 F.2d 1311, 1519 (1983).  The district court erred in its analysis related to the four standards.

      *1.*     *The District Court Improperly Determined That The Challengers Could Pursue A Private Right Of Action For Alleged Violations Of The Supremacy Clause*

          a.     <u>As the Immigration and Naturalization Act ("INA") does not create a federal right or evidence intent to create a private remedy, the district court erred in determining that this action may be pursued under 42 U.S.C. § 1983</u>

The district court improperly determined that the INA created a private right that is enforceable under 42 U.S.C. § 1983.  In doing so the district court determined that the Challengers to HB87 properly brought their claim of preemption under 42 U.S.C. § 1983.

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Section 1983 creates a cause of action where there has been injury, under color of state law, to the person or to the constitutional or federal

statutory rights which emanate from or are guaranteed to the person. In the broad sense, every cause of action under § 1983 which is well-founded results from 'personal injuries.' *Wilson v. Garcia,* 471 U.S. 261, 267-68 (1985); *Almond* v. *Kent*, 459 F.2d 200, 204 (4th Cir. 1972). This has been interpreted to give full effect to its broad language, recognizing that § 1983 "provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell v. Dep't of Social Servs.*, 436 U.S. 656, 700-701(1978).

The "prime focus" of § 1983 and related provisions was to ensure "a right of action to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto." *Chapman* v. *Houston Welfare Rights Organization*, 441 U.S. 600, 611 (1979). 17 Stat. 13; *see, e. g., Lynch* v. *Household Finance Corp.*, 405 U.S. 538, 545 (1972); *Monroe* v. *Pape*, 365 U.S. 167, 171 (1961); *see also,* Cong. Globe, 42 Cong., 1st Sess., App. 68, 80, 83-85.

Section 1983 provides a cause of action for violations of federal statutes as well as the Constitution, *see Maine v. Thiboutot,* 448 U.S. 1, 4 (1980), but plaintiffs must establish the violation of a federal *right,* not just the violation of federal law. *See Blessing v. Freestone,* 520 U.S. 329, 340 (1997); *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283 (2002) ("it is *rights,* not

the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [Section 1983].") (emphasis in original). Such federal rights must be "unambiguously conferred" in the relevant statute, as indicated by "rights-creating" language and by an individual, rather than aggregate, focus. *Id.* at 283, 287-288.

The following factors are particularly relevant in assessing whether a statute confers a federal right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Blessing,* 520 U.S. at 340-41.

The district court found that since some immigrants have been defined as "special immigrants" and are provided with "specific and definite protections provided by the [INA]" the Challengers have a federally enforceable right that can be pursued under § 1983. This finding failed to reference any indication by Congress that the passage of the INA was to benefit the individuals who brought this action or that it had an individual rather than an aggregate focus. To the contrary, the intent was to regulate who could enter the country, under what circumstances, and how long they

could legally remain. Even if there were some implied federal right, any such right is so vague and amorphous that it would be unenforceable and cannot be actionable. *Gonzaga*, 536 U.S. at 282. There is no evidence to support a finding that the INA was enacted to create a right for persons who entered the country illegally or assisted others in doing so.

Assuming a private right, there must also be an intent to create a private remedy. *Id.* at 285. The presumption that such a remedy exists can be rebutted by showing that Congress created a comprehensive enforcement scheme. *Id.* Congress clearly created a detailed enforcement scheme containing both civil and criminal penalties for those who illegally enter the country or assist others in doing so. The district court's finding failed to consider this analysis. The INA does not have any "right-creating language." Moreover, as both the court and Challengers noted, the INA is a comprehensive enforcement scheme which in and of itself precludes an action under § 1983.

Neither the district court nor Challengers show that an action for preemption can be brought under § 1983 absent some other federally enforceable right. Indeed, since the Supremacy Clause is not a source of any federal right but only secures rights by according them priority when they are in conflict with federal law, no such argument could be made. *See*

*Chapman,* 441 U.S. at 613; *See also Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989). As a result this Circuit, and others, have determined that claims for preemption are not cognizable under § 1983. *See Pirolo v. City of Clearwater,* 711 F.2d 1006 (11th Cir. 1983) (preemption claim is not cognizable under § 1983); *Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1529 n. 9 (11th Cir. 1988)(same); *Planned Parenthood v. Sanchez;* 480 F.3d 734 (5th Cir. 2007); *Western Airlines Inc. v. Port Authority of NY and NJ*, 817 F.2d 222 (2nd Cir. 1987)(same); *Gould v. Wisconsin Dep't of Industry, Labor & Human Relations*, 750 F.2d 608 (7th Cir. 1984)(same); *Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996). The holding that a claim for preemption is properly brought under 42 U.S.C. § 1983 is incorrect as a matter of law and should be reversed.

    b.  The Constitution Does Not Provide a Vehicle for a Private Suit Alleging Preemption under the Supremacy Clause

  The district court improperly determined that federal jurisdiction to entertain claims related to preemption is equivalent to a valid private right of action. As jurisdiction and availability of a privately enforceable remedy are not the same, the district court's ruling was erroneous. Indeed, even actions brought under § 1983 require a separate statute for federal courts to

adjudicate the claim. *Hagans v. Lavine*, 415 U.S. 528, 535 (1974); *See also* 28 U.S.C. §§ 1331, 1343.

The Supreme Court has repeatedly held that the Supremacy Clause is not a "source of any federal rights." *Golden State Transit Corp*, 493 U.S. at 107; *Chapman*, 441 U.S. at 613 & n. 29. Rather, the Court has contrasted the Supremacy Clause—which is not a source of any federal right—with the Commerce Clause, which "of its own force imposes limitations on state regulation of commerce and is the source of a right of action in those injured by regulations that exceed such limitations." *Dennis v. Higgins*, 498 U.S. 439, 450 (1991). The Supremacy Clause operates to supply a rule of decision for parties who are properly before the Court. *Chapman*, 441 U.S. at 613. As the Clause does not provide for individual rights, it similarly cannot provide a vehicle for enforcement. Consequently, the district court's holding was erroneous.

### 2. *The District Court Improperly Determined That Sections 7 And 8 Were Preempted*

Challengers maintained that HB87 is preempted, in its entirety, by the INA. While noting that a Federal law preempts a state law only in three circumstances, the district court failed to apply the controlling law when it

determined that Sections 7 and 8 of HB87 were preempted by Federal law. [4]

The Court found that Section 8 was preempted as it 1) will increase the number of queries to the federal government from Georgia regarding immigration status; 2) allows local officers discretion in determining whether to initiate an investigation; and 3) potentially causes an adverse impact on foreign relations. (R. 93 p. 25-26). Similarly, as to Section 7, the district court found that Section 7 is preempted as it: 1) provides for prosecutorial discretion in interpreting immigration law thus removing the penalty for illegal immigration from the Federal government; 2) is not a traditional state function; and 3) *potentially* causes an adverse impact on foreign relations. (R. 93 p. 34-35).

a.    It was error for the district court not to apply a presumption against preemption

The district court failed to apply a presumption against preemption. Specifically, the district court determined that, "[e]nforcement of civil immigration offenses is not 'a field which the States have traditionally occupied'….the Court will not apply a presumption against preemption";

---

[4] Courts recognize three types of preemption: (1) express preemption, where a federal statute contains "explicit preemptive language"; (2) field preemption, where the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"; and (3) conflict preemption, where "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 604-05(1991).

and that "unlike concurrent state and federal regulations in other areas, the movement of unauthorized aliens is not a traditional area of state regulation." (R. 93 p. 21, 35). These findings fail to acknowledge the states' interest in deterring the encouragement of illegal activity and the traditional role that states have in defining what is/is not criminal within their borders and ignored the intent of Congress in creating a partnership with the states in determining who is/is not in the country legally. The court further erred by finding that the lack of a traditional state function necessarily eliminates the presumption against preemption.

The district court relied on *Wyeth v. Levine*, 129 S.Ct. 1187, 1194 (2009) in finding that the State was not entitled to a presumption of preemption. This reliance was misplaced. In *Wyeth,* the Court, finding no preemption, stated, "in **all** pre-emption cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 1194-95 (internal cites omitted; emphasis added) (noting presumption applies "particularly" when subject is a traditional state function). So, while the State disagrees that HB87 falls outside of traditional state function, even if true, the legislation would still be entitled to a presumption against preemption.

Challengers maintained that HB87 was preempted by federal law. There has been no contention or argument that Congress made an express declaration; rather, the district court found that HB87 is impliedly preempted by federal law. And, when the claim is that federal law impliedly preempts state law, courts require a "strong" showing of a conflict "to overcome the presumption that state and local regulation . . . can constitutionally coexist with federal regulation." *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U.S. 707, 716 (1985). While the district court determined, and the State does not disagree, that the historic authority over immigration has not rested with the states, the court failed to recognize that HB87 does not regulate immigration but rather creates criminal consequences for those who entice, harbor or transport illegal aliens and establishes local law enforcement authority to investigate immigration status. Defining criminal activity and local law enforcement authority that does not otherwise conflict with federal law, certainly falls within a traditional state function. *Pace v. CSX Transp., Inc.,* 613 F.3d 1066, 1069 (11th Cir. 2010) ("[T]he assumption that the historic police powers of the states are not superseded by federal law unless preemption is the clear and manifest purpose of Congress.") (cites omitted). Consequently, the district

court's failure to provide the legislation with a presumption against preemption was erroneous.

Had the district court properly applied the presumption it would have read federal statutes whenever possible not to preempt state law. *See Altria Group, Inc.* v. *Good*, 555 U.S. 70, 77 (2008) ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption'") (quoting *Bates* v. *Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). The district court failed to do this in many respects resulting in the improper conclusion Challengers are likely to succeed on the merits of their preemption claims.

      b.    <u>The district court erred in finding conflict preemption where it is possible to comply with both HB87 and Federal law</u>

The district court found Sections 7 and 8 were in conflict with federal law. Specifically, the district court found that by allowing local police discretion to investigate alienage and take action Section 8 conflicts with federal law. The court noted that federal law allows the states to: 1) enter into agreements with the federal government to enforce immigration law (8 U.S.C. § 1357); 2) arrest illegal aliens who have been convicted of a felony (8 U.S.C. § 1252(c); and 3) defines other ways where local law enforcement can enforce immigration law (8 U.S.C. § 1103). (R. 93 p. 24). This finding

presumes that the existence of some federal legislation related to a subject necessarily prohibits state regulation in the same area, regardless of whether there is a direct conflict in the enforcement of both statutes. This holding ignores prevailing authority interpreting conflict preemption. State law is preempted only to the extent it actually conflicts with federal law. "Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, . . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County v. Automated Med. Lab.,* 471 U.S. 707, 713 (1985) (internal quotations and citations omitted).

In our federalist system, Congress does not "cavalierly pre-empt state-law …." *Crosby* v. *National Foreign Trade Council*, 530 U.S. 363, 372-373 (2000). Federal law impliedly pre-empts state law when state and federal law "conflict" -- *i.e.*, when "it is impossible for a private party to comply with both state and federal law" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted). There must be an "inevitable collision" between federal and state law. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143 (1963). "The existence of a hypothetical or potential conflict is insufficient to warrant" pre-emption.

*Rice* v. *Norman Williams Co.*, 458 U.S. 654, 659 (1982); *see also Gade* v. *National Solid Wastes Management Assn.*, 505 U.S. 88, 110 (1992) (KENNEDY, J., concurring in part and in judgment).

Conflict pre-emption may also be found, even absent impossibility, where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (internal quotation marks omitted); *see*, *e.g.*, *Geier* v. *American Honda Motor Co.*, 529 U.S. 861, 886 (2000); *Barnett Bank of Marion Cty., N. A.* v. *Nelson*, 517 U.S. 25, 31 (1996). This is the principle largely relied upon by Challengers and the district court.

Rather than discourage state and local involvement, federal law invites state and local participation to battle illegal immigration. The subsection at issue notes, "Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State of political subdivision of a State (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention or removal of

aliens not lawfully present in the United States." 8 U.S.C. § 1357 (g)(10)(2000).

The Court's reliance on 8 U.S.C. § 1252(c) is similarly misplaced as evidenced by a plain reading of the statute which states, "[n]otwithstanding any other provision of law, to the extent permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who . . . ." It is clear from the second quoted clause, "to the extent permitted by state and local law," that Congress did not intend to preempt state and local law when it granted authority to arrest illegal aliens to state and local law enforcement officers. Indeed, the exercise of that power is specifically made dependent on state and local authorization. The second clause of the introductory language expressly negates any intent to preempt state-law limitations on state or local authority to arrest, and strongly suggests an intent to rely solely on state-law authorization to arrest, rather than to alter such authorization. *See United States v. Vasquez-Alvarez*, 176 F. 3d 1294, 1298 (10th Cir. 1999).

Further evidence of congressional intent to partner with state and local governments in enforcement is embodied in 8 U.S.C. § 1373, which provides:

> (a) In general. Notwithstanding any other provision of
> Federal, State, or local law, a Federal, State, or local

government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries. The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

Congressional commitment to joint enforcement was also stated in 8 U.S.C.

§ 1644 (1996) which provides:

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

These provisions indicate that Congress intended for state and local

governments to participate in the enforcement of immigration consistent

with its determination of status. HB87 is Georgia's attempt to provide that assistance.

In highlighting its concerns the district court noted that the discretion provided to local law enforcement by HB87 to, upon probable cause to believe another crime has been committed, take reasonable steps to investigate immigration status and then take other action that is authorized by other state and federal law undermines the federal governments' enforcement priorities and as a result stands as an obstacle to the intent of Congress. (R. 93. p. 26-27). The court's conclusion is not supported by the statutory scheme noted above. While the executive branch of the federal government may need or choose to establish priorities related to enforcement as a result of limited resources or political preference, nothing about these priorities alters the intent of Congress which clearly contemplates joint enforcement of the federal immigration act.

The court also noted the similarities in 8 U.S.C. § 1324 and Section 7 but found that since the provisions were not identical that they are preempted. (R. 93 p. 31). There is no support for the finding that the language must be identical to avoid preemption. Rather, courts have found that where, as here, the federal and state statutes mirror similar objectives, the state statute would not be preempted. *Plyler v. Doe*, 457 U.S. 202, 225

(1982). Despite minor language differences, the objectives of HB87 and § 1324 are the same—to discourage those who lure illegal immigrants and facilitate their remaining in the country illegally. While the Court cited to cases interpreting § 1324, it failed to evidence how HB87 conflicted with those interpretations or that applying the same interpretations to similar language in HB87 would not avoid any potential conflict. The district court chose to read § 1324 as narrowly as possible while reading similar language in HB87 as broadly as possible. Nothing about either section interprets immigration law inconsistently from that of the federal government. These provisions create clear guidelines for state and local officers to cooperate with the federal government and investigate the status of individuals who are believed to have already acted criminally and for a state system of enforcement for individuals who first commit a criminal offense and then engage in activity that lures illegal immigrants into the state and encourages them to remain. Nothing presented to the district court shows a conflict with the intent of the statutory scheme which clearly evidences a need and desire to cooperate with state and local governments.

### 3. *The District Court Erred In Finding That HB87 Invades A Field That Congress Intended To Occupy Exclusively*

The district court also erred in finding first that since Congress created a "complete scheme of regulation" state power is confined to the "narrowest

of limits" and secondly that state action is inconsistent with the purpose of Congress to regulate the field. (R. 93 p. 35). In so finding, the court determined that Challengers were likely to prevail on their claim that the field is preempted from regulation. As noted above, the court was incorrect in its initial premise that state power has been narrowly defined by Congress. The key factor in assessing field preemption is Congressional intent. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The Supreme Court has recognized that there is a presumption against field preemption unless congressional intent to preempt is clear and manifest. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).

Field preemption arises when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). To be applicable, "congressional intent to supersede state laws must be 'clear and manifest.'" *Id*. (citation omitted). Congress's intent for federal law to occupy a field exclusively "may be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* at 79 (internal

punctuation omitted). The district court's order touches on both of these principals.

As to the first principal, Congress clearly left the door open for state involvement as evidenced by § 1324 and § 1644. Moreover, as § 1644 prohibits states from restricting investigation into alien status and the district court has enjoined the State's attempt to do so, it is the district court, not the State that is interfering with congressional intent.

As for foreign affairs preemption, the Supreme Court suggested the following analysis:

> If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict . . . . Where, however, a State has acted within what Justice Harlan called its 'traditional competence' . . . but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted.

*American Ins. Association v. Garamendi*, 539 U.S. 396, 419 n.11 (2003). Although dictum, this principle from Garamendi provides useful guidance: because the exercise of police power is within the "traditional competence" of the states, vague notions of a possible impact on federal foreign policy do

not support field preemption. Instead, a clear or substantial conflict must be demonstrated, something that does not appear in this case.

Nothing in HB87 conflicts with a federal law or treaty or laws relating to alienage. The district court held that since alienage is addressed in HB87 and immigration is within the exclusive role of the Federal government that the law is preempted. HB87, however, does not define immigration status: "the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Rica*, 424 U.S. 351, 355 (1976). Moreover, "even if such local regulation has some purely speculative and indirect impact on immigration, it does not thereby become a constitutionally proscribed regulation of immigration." *Id.* The "concerns" highlighted by *amici* are speculative attempts to redefine the scope of the Bill and imply a negative impact on foreign relations. This argument was soundly rejected in the in *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011), where the Supreme Court found no preemption where the state law does not directly impede the operation of a federal program. *Id.* at 1983. HB87 does not directly impede the operation of a

federal program thus the district court's determination was erroneous. *De Canas*, 424 U.S. at 355-63.

    4.    *Challengers Failed To Show That There Were No Set Of Circumstances Where HB87 Would Be Constitutional*

In determining that Challengers are likely to prevail on the merits, the district court failed to follow established rules related to facial challenges. Specifically, the district court cites to unique factual circumstances where HB87 could potentially run afoul of federal dictates or enforcement decisions. (R. 93 p. 15; 24; 32; 34) Facial challenges, however, are disfavored in the law. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). A facial challenge can succeed only when a plaintiff shows that "no set of circumstances exists under which the [statute] would be valid." *Id.* at 449 (*quoting United States v. Salerno*, 481 U.S. 739, 745 (1987)). To be facially invalid, the law must be unconstitutional in *all* of its applications. *Id.*; *Village of Hoffman Estates v. The Flipside, Hoffman Estates*, 455 U.S. 489, 494 n.5 (1982) (a successful facial challenge means that the law is incapable of any valid application).

A statute "should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). A court may choose to adopt a narrowing construction if that construction is "reasonable" and "readily

apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). Assuming a potential for conflict with federal law, reading Section 7 to be consistent with 8 U.S.C. § 1324 and Section 8 as a mechanism for Georgia law enforcement to comply with the federal mandate for cooperation evidenced by 8 U.S.C. § 1644 would resolve any such conflict. The district court's failure to narrowly construe these provisions was error.

### 5. *Deal And Olens Were Not Properly Enjoined*

Deal and Olens are proper parties for a facial challenge to the statute. Neither, however, has authority to direct local law enforcement. The Georgia Constitution generally provides that it is the Governor's responsibility to, "take care that the laws are faithfully executed and shall be the conservator of the peace. . . ." The Governor is vested with, "The chief executive powers . . . ." Ga. Const. art. IV, § 2, P 1. Under the Georgia Constitution, "[t]he Attorney General shall act as the legal advisor of the executive department, shall represent the State in the Supreme Court in all capital felonies and in all civil and criminal cases in any court when required by the Governor, and shall perform such other duties as shall be required by law." Ga. Const. art. V, § 3, P 4. No constitutional or statutory provision allows the Governor or the Attorney General to dictate to independently

elected officials or to locally appointed law enforcement officers what law enforcement action may or may not be taken.

Instead, the Georgia Constitution provides for the "self-government of municipalities." Ga. Const. art. IX, § 2, ¶ 1, 2. Counties are authorized to provide police protection. *Id.* at ¶ 3. The county police are under the control of the county governing authority and have law enforcement powers, including the power to make arrests and execute and return criminal warrants in the county of appointment. O.C.G.A. § 36-8-5. Sheriffs are constitutional "county officers" who are "elected by the qualified voters of their respective counties" and who "have such qualifications, powers, and duties as provided by the general law." Ga. Const. art. IX, § 1, ¶ 3(a).

As independently elected officials, the local sheriffs have specific duties, including the enforcement of State laws. Sheriffs do not act under the direction of the Governor or the Attorney General. O.C.G.A. §§ 15-16-9, 15-16-10. Thus, it is the responsibility of local law enforcement to manage the enforcement of the provisions of the Statute and Governor Deal and Attorney General Olens in their official capacities cannot enforce this injunction.

Since neither the Governor nor the Attorney General have enforcement authority over local law enforcement, these claims against them

are barred by the Eleventh Amendment.  The *Ex Parte Young* exception does not apply when the defendant has no connection to the enforcement of the challenged act.  *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999).  Because the Governor and Attorney General have no authority to enforce provisions of criminal statutes, the *Ex Parte Young* doctrine does not apply and this injunction is barred by the Eleventh Amendment.[5]

> ### 6. Challengers Failed To Show Irreparable Harm Absent The Granting Of A Preliminary Injunction

The district court found that Challengers would suffer irreparable harm because they would be subject to criminal penalties under laws that might be preempted. (R. 93 p. 44).

A showing of irreparable injury is "the *sine qua non* of injunctive relief."  *Siegel v. LaPore*, 234 F.3d 1163 (11th Cir. 2000).  It cannot be presumed, even where there is a violation of constitutional rights.  *Id.* at 1177.  In all cases, a movant for a preliminary injunction against a state or local government must present facts that show a "real and immediate" threat of substantial, irreparable harm before a federal court will intervene. *O'Shea*, 414 U.S. at 494.

---

[5] The district court correctly noted that the Attorney General has some enforcement responsibilities under HB87.  This authority, however, is limited and was not subject to the Court's preliminary injunction.

An injury is "irreparable" only if it cannot be undone through monetary remedies. "The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974); *Northeastern Florida Chapter v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990).

The district court essentially presumed injury based upon the possibility that Challengers may be arrested and/or questioned as a result of a statute that might be preempted.[6] This finding failed to recognize one of the key components of both Sections 7 and 8. Neither section activates prior to an officer's determination of probable cause that another criminal offense has been committed. Once probable cause is found the officer has the authority to arrest, detain or interrogate the subject even absent the provisions enumerated in HB87. *Ashcroft v. Al-Kidd*, No. 10-98, *slip op.* 3-9 (U.S. May 31, 2011)(courts will not look to subjective intent when

---

[6] The court also appeared to presume harm as a result of alleged violations of the Supremacy Clause. While this Court and others have liberally construed harm where fundamental rights were at issue, as noted previously, the Supremacy Clause is not a source of fundamental rights thus this finding was erroneous.

determining validity of detention); *See also Muehler v. Mena*, 544 U.S. 93 (2005)(questioning about immigration status when individual is already legally detained does not amount to a separate seizure). Further, as Challengers readily acknowledged, state and local law enforcement have authority to arrest under 8 U.S.C. § 1324. (R. 29 p. 5). In finding Challengers are likely to suffer irreparable harm the district court determined that the risk of being caught and prosecuted was heightened. There is simply no support for finding that a greater likelihood of suffering perfectly lawful consequences equates to irreparable harm.

A prayer for injunctive and declaratory relief requires an assessment of whether the plaintiff has sufficiently shown a real and immediate threat of future harm. *See Lyons*, 461 U.S. at 105. "The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent." *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006). As any person subjected to application of Sections 7 and 8 would have already been subject to arrest, detention and questioning based upon clear statutory terms, the district court erred in determining Challengers established irreparable harm.[7]

---

[7] Challengers also argued that they would be subject to racial profiling as a result of HB87. As it is presumed police will properly discharge their duties this argument is

The district court also disregarded the State's argument that there is potential harm to individuals who enter this country illegally in hopes of a better life who are then victimized by employers or others, forced to work in horrific conditions with inadequate pay and otherwise taken advantage of as result of their immigrant status. This potential was noted by the Supreme Court in *United States v. Brignoni-Ponce,* 422 U.S. 873, 879 (1975) ("The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation."). Indeed, when Congress passed the INA it recognized that undocumented aliens had historically been victims of exploitation and deprived of legal rights. One of the primary reasons for the passage of INA was that "[a] subclass of people who cannot exercise their rights has been created." Cong. Rec. H10598 (daily ed. Oct. 15, 1986) (remarks of Rep. McKinney).[8] While recognizing the substantial impact of illegal immigrants on Georgia's economy, there is also a need to protect illegal immigrants from abuses. By creating a legal mechanism where individuals who transport, harbor and

---

improper. *See Bracy v. Bramley*, 520 U.S. 899, 908 (1997)(quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

[8] The stated purpose of 29 U.S.C. § 1801 et seq, is, "to remove the restraints in commerce caused by activities detrimental to migrant and…and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers." 29 U.S.C. § 1801.

entice illegal aliens into the state are punished, Georgia protects illegal aliens from these abuses.

> 7.      *The District Court Erred In Finding That The Equities Balanced In Favor Of The Injunction.*

The Supreme Court of the United States has cautioned,

> Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.... When the frame of reference moves from a unitary court system....to a system of federal courts representing the Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief.

*Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)(citations omitted).  "[T]hese principles []have applicability where injunctive relief is sought, not against the judicial branch of state government, but against those in charge of an executive branch of an agency of state or local governments...." *Id.* at 380.

On a motion for preliminary injunction Plaintiffs bear the burden of showing that their perceived injuries outweigh the damage that the preliminary injunction might cause to Defendants. *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir. 1988).  Challengers' speculative harm fails to meet their burden as the consequence--detention, questioning and/or arrest--remains a possibility absent HB87.

In weighing the equities, the district court, properly noted that the public's interest is protected by protecting civil rights. While certainly a legal truism, as the Supremacy Clause is not the source of any right, this determination does not tip the scales in Challengers' favor.

The district court failed to recognize the significance of the public interest in the enforcement of HB87. While not every illegal immigrant will need to visit an emergency room, commit a criminal offense or otherwise need government care, there is a risk that every illegal immigrant will utilize some of the scarce resources available to government. This interest outweighs the interests of those who commit criminal acts in the state while in the act of transporting, harboring or enticing illegal aliens. It also outweighs the interest of individuals who commit criminal acts and might be detained to determine status. Finally, it outweighs the speculative impact to the organizational Challengers who are largely exempt from the provisions of HB87.

Approximately 5% of the population of Georgia is in the country illegally, which represents a 9% average annual increase from 2000 to 2009. (R. 70, Ex. A, *A Description of the Immigrant Population: An Update*, June 2011; p. 17). The impact that this population has on state and local governments is hard to quantify but is notably significant, particularly in

areas related to health care, law enforcement and education. (R. 70, Ex. B, *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*, December 2007, pp.7-11).

In *De Canas,* 424 U.S. at 354, the Court upheld a California statute prohibiting an employer from knowingly employing an alien not entitled to lawful residence in the United States against arguments that it was preempted by the INA. Justice Brennan, writing for the court, recognized the vital state interests sought to be protected by the statute:

> Employment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions. …In attempting to protect California's *fiscal interests and lawfully resident labor force from the deleterious effects on its economy resulting from the employment of illegal aliens, § 2805(a) focuses directly upon these essentially local problems and is tailored to combat effectively the perceived evils.*

Id. at 357(emphasis supplied).

These problems are equally present in Georgia where unemployment is at 9.8%, which exceeds the national average of 9.1%. (R. 70, Ex. C. ¶ 3). Since many Georgians are out of work, reducing the number of illegal aliens in the workforce would help decrease the number of Georgians who are unemployed. (R. 70, Ex. C ¶ 5).

No one can dispute the shortage of government resources in light of the recession resulting in significant budget cuts in the state. Georgia has cut funding to education, public health, the elderly and disabled, and higher education. (R. 70, Ex. D; *Center of Budget and Policy Priorities, An Update of State Budget Cuts,* February 9, 2011, Nicholas Johnson, Phil Oliff and Erica Williams). The state budget has decreased in the last several years. (R. 70, Ex. E). Total available state revenues in Fiscal Year 2007 were $19,895,976,559 compared to $19,799,134,318 in FY 2008, $17,832,365,614 in FY 2009, and $16,251,244,424 in FY 2010. FY 2011 did not close until June 30, 2011, so final numbers were not yet available. Projected revenue numbers for FY 2011 and FY 2012 are $18,063,622,184 in FY 2011, and $18,295,831,853 in FY 2012. (R. 70, Ex. E, ¶ 3). Declining revenue has resulted in significant budget cuts.

From the original FY 2009 budget to the FY 2012 budget, Education has fallen 15.38%; Healthcare 3.17%; Public Safety 11.59%; General Government 40.83%; Economic Development 49.22%; and Transportation 15.53%. (R. 70, Ex. E, ¶ 4).[9]

---

[9] In addition, the state has depleted reserves, furloughed employees and significantly trimmed expenditures in order to account for the budget shortfalls. (R. 70, Ex. E, ¶ 5-6).

Illegal aliens utilize these valuable resources in several ways. Over the last 12 months the Georgia Department of Corrections spent approximately $16,561,875 housing illegal immigrants. (R. 70, Ex. F, ¶ 4).

Local jails also bear the impact of the illegal immigrant population. Gwinnett County alone, spends approximately $8,344,000 annually for illegal aliens within its jails. (R. 70, Ex. G, ¶ 4, 5, 6 and attachment). (R. 70, Ex. G, ¶ 5). Cobb County spends approximately $4,932,975 annually housing illegal immigrants within its jails. (R. 70, Ex. H, ¶ 4).

Admittedly, there is no guarantee that, with proper enforcement of HB87, no illegal immigrant will commit a crime warranting incarceration. However, if people are concerned about enforcement of HB87 for actions related to transporting, harboring or enticing an illegal alien, by their own admission, it will be more difficult for illegal immigrants to remain in this state and thus reduce the cost. Indeed, as the sheriff in Cobb County noted, once there was greater enforcement of 287g[10] within the county, the arrests of illegal aliens reduced 43.8% over time. (R. 70, Ex. H ¶ 4) It stands to reason that the State would see similar reductions.

Another area of significant cost to the State is in the provision of medical care. While generally illegal immigrants are not entitled to

---

[10] An agreement under 8 U.S.C. § 1357 (g).

Medicaid, an exception is made for emergency medical care. (R. 70, Ex. K , ¶3). Total Medicaid expenses incurred in Georgia by illegal immigrants were $31,922,225.69 in FY 2007; $23,795,818.47 in FY 2008. $25,876,282.60 in FY 2009; $28,601,668.82 in FY 2010; and $53,234,092.15 to date in FY 2011. The State of Georgia was responsible for 50% of these amounts. (R. 70, Ex. K, ¶ 4).  Not only are these expenditures significant, they almost doubled in this past fiscal year.

It is indisputable that there are significant costs incurred as a result of a substantial illegal alien population.  The district court erred in failing to acknowledge the impact of these costs in balancing the equities in this case.

## CONCLUSION

For the foregoing reasons, the district court's grant of the Motion for Preliminary Injunction should be reversed.

Respectfully submitted this 15th day of August, 2011.

SAMUEL S. OLENS                 551540
Attorney General

KATHLEEN M. PACIOUS      558555
Deputy Attorney General

/s/ Devon Orland
DEVON ORLAND                 554301
Sr. Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

DEVON ORLAND
Sr. Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30334-1300
PH:   (404) 463-8850
FAX:  (404) 651-5304

**CERTIFICATE OF SERVICE**

I do hereby certify that I have this date served the within and

foregoing **BRIEF OF APPELLANTS** prior to filing same, by depositing a

copy thereof, postage prepaid, in the United States Mail, properly addressed

upon:

| | |
|---|---|
| Andre I Segura<br>American Civil Liberties Union<br>Foundation-NY<br>125 Broad Street<br>18TH Floor<br>New York, NY 10004 | Karen C Tumlin<br>National Immigration Law Center<br>Suite 2850<br>3435 Wilshire Boulevard<br>Los Angeles, CA 90010 |
| Cecillia D Wang<br>ACLU Immigrant's Rights Project<br>39 Drumm Street<br>San Francisco, CA 94111 | Katherine Desormeau<br>ACLU Immigrant's Rights Project<br>39 Drumm Street<br>San Francisco, CA 94111 |
| Elora Mukherjee<br>ACLU Racial Justice Program<br>18TH Floor<br>125 Broad Street<br>New York, NY 10004 | Kenneth John Sugarman<br>ACLU Immigrant's Rights Project<br>39 Drumm Street<br>San Francisco, CA 94111 |
| Jonathan Blazer<br>National Immigration Law Center<br>405 14th Street, Suite 1400<br>Oakland, CA 94612 | Linton Joaquin<br>National Immigration Law Center<br>Suite 2850<br>3435 Wilshire Boulevard<br>Los Angeles, CA 90010 |

Nora Preciado
National Immigration Law Center
Suite 2850
3435 Wilshire Boulevard
Los Angles, CA  90010

Samuel Brooke
Southern Poverty Law Center-Al
400 Washington Avenue
Montgomery, AL  36104

Sin Yen Ling
Asian Law Caucus
55 Columbus Avenue
San Francisco, CA  94111

Tanya Broder
National Immigration Law Center
Suite 1400
405 14th Street
Oakland, CA  94612

Andrew H Turner
Southern Poverty Law Center-AL
400 Washington Avenue
Montgomery, AL  36104

Azadeh N Shahshahani
Aclu of Georgia
Building 400, Suite 425
1900 the Exchange, SE
Atlanta, GA  30339

Chara Fisher Jackson
ACLU of Georgia
Building 400, Suite 425
1900 the Exchange, SE
Atlanta, GA  30339

Charles H Kuck
Kuck Immigration Partners LLC
8010 Roswell Road
Suite 300
Atlanta, GA  30350

Daniel Werner
Immigrant Justice Project
Southern Poverty Law Center
Suite 2150
233 Peachtree Street, NE
Atlanta, GA  30303

Danielle M Conley
Kuck Immigration Partners LLC
Suite 300
8010 Roswell Road
Atlanta, GA  30350

George Brian Spears
Law Office of Brian Spears
1126 Ponce De Leon Avenue
Atlanta, GA  30306

Mary C Bauer
Southern Poverty Law Center-Al
400 Washington Avenue
Montgomery, AL  36104

Robert Keegan Federal , Jr
Federal & Hasson, LLP
Suite 1776
Two Ravinia Drive
Atlanta , GA  30346

Christopher R Clark
Dewey & Leboeuf, LLP-NY
1301 Avenue of He Americas
New York , NY  10019

Henry L Solano
Dewey & Leboeuf, LLP-NY
1301 Avenue of the Americas
New York , NY  10019

Emmet J Bondurant , II
Bondurant Mixson & Elmore, LLP
1201 West Peachtree Street, NW
3900 One Atlantic Center
Atlanta , GA  30309-3417

Dale M. Schwartz
Dale M Schwartz & Associates
5500 Interstate North Parkway
Riveredge One, Suite 450
Atlanta , GA  30328-4662

Gerald Jason Thompson
The Thompson Law Firm
Suite 101
200 East Crogan Street
Lawrenceville , GA  30046

Socheat Chea
Socheat Chea, PC
Bldg 300, 500 Duluth Park Lane
Duluth , GA  30096

Farrin Rose Anello
Immigration Clinic
University of Miami School of Law
1311 Miller Drive, E257
Coral Gables , FL  33146

Rebecca Ann Sharpless
Immigration Clinic
University of Miami School of Law
1311 Miller Drive, E257
Coral Gables , FL  33146

Carla Gorniak
Dewey & Leboeuf, LLP-NY
1301 Avenue of the Americas
New York , NY  10019

Pickens Andrew Patterson, Jr.
Smith, Gambrell & Russell, LLP
Promenade II, Suite 3100
1230 Peachtree Street, NE
Atlanta, GA  30309-3592

This 15th day of August, 2011.

/s/ Devon Orland
Devon Orland Bar No. 554301
Counsel for Appellants